## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

UNITED STATES OF AMERICA ex rel.
JOSEPH SCOTT,

Plaintiff,

v.

UNITED LAUNCH ALLIANCE, L.L.C,
a Delaware limited liability company,

Defendant.

---

### FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL

### (FILED *EX PARTE* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2))

---

Joseph Scott ("Relator") brings this action for himself and on behalf of the United States of America against United Launch Alliance, LLC and United Launch Services, LLC (collectively "ULA").  Relator sues ULA for violations of the Federal Civil False Claims Act, 31 U.S.C. § 3729 et seq. (the "False Claims Act") and for damages resulting from ULA's retaliatory termination of Relator's employment after he brought to light the false claims at issue.  This Complaint is filed *ex parte* and under seal pursuant to 31. U.S.C. § 3730(B)(2).

### I.   INTRODUCTION

1.      ULA provides space launch services to various divisions of the United Sates government. This Complaint describes ULA's practices of knowingly and willfully submitting inflated labor estimates in connection with such services.

2.      In the commercial marketplace, prices of goods and services are typically determined by market forces and prices are not based on the seller's expenses. By contrast, in the aerospace industry, sellers often face little or no competition and contract pricing is based largely on the contractor's actual or estimated costs.

3.      During his employment with ULA, Relator discovered a pervasive practice within ULA of inflating its labor estimates in numerous bids to U.S. government customers. The problem stemmed primarily from ULA's Supplier Management & Procurement (SM&P) group, which was responsible for purchasing parts and materials for ULA's space launch missions. ULA would inflate the estimated labor hours required for ULA personnel to purchase parts and materials from commercial vendors.

4.      ULA estimated its labor using a simple grid or "model" (named the "Keith Crohn Model" and referenced in ULA's Estimating Manual) that assigned labor hours to the price of the item, regardless of the nature of the item or any other factors that could affect procurement costs. For example, if the item procured costs between $1 and $1,000, the grid would assign an estimated labor value of 8 hours. If the item price increased, so too would the estimated labor. This is a form of parametric estimation.

5.      Under the Federal Acquisition Regulation (FAR) applicable to U.S. Government contractors, parametric estimation is permitted only where there is no other data or information that can be used to more accurately estimate costs. As well, parametric estimation requires validation testing, which did not occur with the Keith Crohn Model. Additionally, the FAR requires the use of actual financial data as is captured in a firm's (e.g.) accounting and estimating systems.  When actual data is available for use in the financial estimation of a firm's proposed

contract to the government, the FAR requires the firm to use that data.  Nevertheless, ULA used the more arbitrary method of estimating labor even where reliable data was available.

6.      For years, ULA submitted bids that willfully ignored historical data on the labor necessary to procure materials, which was consistently less than ULA's estimates. In doing so, ULA violated multiple laws and regulations governing government acquisitions and submitted numerous fraudulent bids to U.S. government customers.

7.      As a result of ULA's conduct, the U.S. government has been charged tens of millions of dollars for work that was never performed while ULA has profited in gross excess of the margins permitted under the parties' agreement and applicable law.

8.      Relator worked to remedy the cost inflation by reporting and discussing the issues with ULA senior management. While many privately agreed with Relator's concerns, no changes were ever implemented and ULA continued its use of the faulty estimation practices.

9.      When Relator detailed his concerns in a formal report within ULA, ULA opened an investigation into *Relator* rather than objectively investigating the overcharges. This included placing a camera above his desk, monitoring and questioning his cell phone and computer usage, and otherwise suggesting that he somehow violated the law or engaged in improper bidding practices himself.

10.     In further retaliation for Relator's report, ULA removed Relator from future projects, assigned his work to others, and ultimately forced him out of the company.

11.     The policies and practices alleged in this Complaint were, on information and belief, established and ratified at the highest corporate level of ULA; however, at all relevant

times, ULA acted through its agents and employees who were acting within the scope of their agency and/or employment.

## II.      JURISDICTION AND VENUE

12.      ULA's conduct as described in this Complaint constitutes violations of the False Claims Act, a federal statute. Thus, this Court has subject matter jurisdiction over Relator's First Cause of Action pursuant to Section 3732(a) of the False Claims Act and 28 U.S.C. § 1331.

13.      This Court has subject matter jurisdiction over Relator's Second Cause of Action for retaliation pursuant to 31 U.S.C . § 3730(h) and 28 U.S.C. § 1331.

14.      Relator's Third Cause of Action for wrongful termination shares a common nucleus of operative fact with his False Claims Act claims. Accordingly, this Court has subject matter jurisdiction over Relator's wrongful termination claim pursuant to 28 U.S.C.A. § 1367.

15.      ULA's conduct occurred primarily in the State of Colorado and ULA resides and transacts business in the State of Colorado. Therefore, this Court has personal jurisdiction over ULA and venue is proper in the District of Colorado pursuant to Section 3732(a) of the False Claims Act and 28 U.S.C. § 1391.

## III.      PARTIES

16.      Upon information and belief, ULA is a Delaware limited liability company with its principal place of business at 9100 E. Mineral Cir., Centennial, CO 80112.

17.      Upon information and belief, ULA is a 50-50 joint venture between Lockheed Martin and The Boeing Company to provide space launch services for the U.S. government.

18.     Upon information and belief, some of ULA's regular customers include the United States Department of Defense, National Aeronautics and Space Administration ("NASA"), the National Reconnaissance Office ("NRO"), and the U.S. Air Force.

19.     Upon information and belief, ULA launch vehicles carry payloads to space, including weather, telecommunications and national security satellites.  ULA presents itself to the public as the "most-experienced" launch service provider, claiming to have delivered more than 95 satellites to orbit.

20.     Upon information and belief, ULA has enjoyed a decade of a near complete monopoly on government contracts for space launch services. Indeed, since the joint venture was formed, ULA has been the subject of numerous lawsuits and investigations relating to Federal Antitrust Law violations.

21.     Relator, Joseph Scott is an individual residing in Douglas County, Colorado.

22.     Prior to joining ULA, Relator had a rising career in wealth and investment management.  From 2001 through 2005, he served as Vice President of the Global Funding Group of Wells Fargo Bank's Treasury.

23.     In or about 2005, he was offered a role with Wells Fargo International, which included relocation to Denver, Co.  In Denver, he was promoted to run the Rocky Mountain region for Wells Fargo International, focusing on currency investments and hedging for both private and corporate customers.

24.     In or about November 2006, ULA recruited Relator to become its Senior Cash Manager and to help build the firm's treasury and manage its money and currency derivative portfolio, which included up to $1 billion in cash and nearly $200 million in currency exposure.

25.     After three years, he was offered the opportunity to join the estimating group with the expectation that he would take over when its then current leader retired.  In that role, Relator was to manage the day to day activities of a staff nearing 25 full-time employees.

26.     Relator's promising career in the estimating group was cut short when he discovered and reported widespread cost inflation in connection ULA's government contracts.

27.     ULA responded to Relator's concerns with retaliation, discrimination and ultimately discharge from the company.

## IV.     THE FALSE CLAIMS ACT

28.     This *quit tam* action alleges violations of the False Claims Act, seeking damages and civil penalties on behalf of the United States and Realtor as a result of Defendant's false claims, statements/certifications and records. The False Claims Act provides, in pertinent part:

> (a)(1) Any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B) ....

> * * *
> is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11 ,000], as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990... , plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

29.     A defendant acted "knowingly" under the False Claims Act if, with respect to the information, the Defendant (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard for the truth or falsity of the information. It is not necessary to prove that the defendant had the specific intent to defraud. 31 U.S.C. § 3729(b)(1)(B).

30.    The False Claims Act is the government's primary tool to recover losses due to fraud and financial abuse by those seeking payment from the United States of America. *See S. Rep. No. 345, 99 Cong., 2"d Sess. at 2 (1986), reprinted in 1986 U.S.C.C.A.N. 5266.

31.    The False Claims Act also includes a "whistleblower" protection provision, providing relief from retaliatory actions:

> **(1) In general.—** Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

> **(2) Relief.—** Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

31 U.S.C. § 3730(h).

32.    Relator brings this action based on his direct knowledge and also upon information and belief. None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. § 3730(e)(4). Accordingly, Relator is an original source of the facts alleged in this Complaint.

33.    As required by Section 3730(a)(2) of the False Claims Act, Relator has provided, to the Attorney General of the United States and to the United States Attorney for the District of Colorado, simultaneous with and/or prior to the filing of this Complaint, a statement of all material evidence and information related to the Complaint (the "Disclosure Statement"). The

Disclosure Statement is supported by material evidence known to Relator at the time of this

filing establishing the existence of the ULA's legal responsibility for false claims. Because the

statement includes attorney-client communications and work product of Relator's attorneys, and

is submitted to the Attorney General and to the United States Attorney in their capacity as

potential co-counsel in the litigation, the Relator maintains the Disclosure Statement is

confidential and privileged.

## V.      FEDERAL ACQUISITION LAWS & REGULTIONS

34.     Historically, there have always been concerns about contractor profiteering in the

defense and aerospace industries. Congress has passed various forms of legislation aimed at

curtailing this problem, such as price fixing, profit limitations, and disclosure requirements. In

addition, the U.S. government has adopted multiple regulations to guide vendors in estimating

and bidding government contracts.

35.     The principal regulation currently governing Government contracts in defense and

aerospace is the Federal Acquisition Regulation ("FAR"). The FAR is promulgated jointly by the

Secretary of Defense, NASA, Office of Federal Procurement Policy, and other entities. Among

other things, the FAR governs contract pricing and estimation of costs.

36.     Another body of legislation aimed at curtailing contractor profiteering is the Truth

in Negotiations Act ("TINA").  TINA was enacted with the specific purpose of preventing

contractors from receiving "unwarranted profits" because of inaccurate or incomplete data used

in establishing target costs or prices.[1] As its name implies, TINA was intended to ensure "truth in

---

[1] S. Rep. 1884, 87th Cong., 2d Sess., *reprinted in* 1962 U.S.C.C.A.N. 2476, 2477 (1962).

negotiating" by giving the Government access to the same cost and pricing data available to the contractor.

37.     Under TINA, unless an exception applies, contractors must provide certified cost or pricing data when the amount of the bid is expected to exceed $750,000.  When certified costs or pricing data is required, the contractor must certify the accuracy and completeness of the information in the following form:

CERTIFICATE OF CURRENT COST OR PRICING DATA

This is to certify that, to the best of my knowledge and belief, the cost or pricing data (as defined in section 2.101 of the Federal Acquisition Regulation (FAR) and required under FAR subsection 15.403-4) submitted, either actually or by specific identification in writing, to the Contracting Officer or to the Contracting Officer's representative in support of are accurate, complete, and current as of_____.

FAR § 15.406-2.

Cost or pricing data is defined as:

all facts that… prudent buyers and sellers would reasonably expect to affect price negotiations significantly... Cost or pricing data are more than historical accounting data; they are all the facts that can be reasonably expected to contribute to the soundness of estimates of future costs and to the validity of determinations of costs already incurred.

FAR § 2.101.

36.     Even where certified cost or pricing data is not required (i.e. contracts less than the $750,000 TINA threshold), the contractor typically still provides the same cost or pricing data without the certification.  This information is referenced in FAR as "data other than certified cost or pricing data."  *Id.*

## VI.   ULA's ESTIMATION AND BIDDING PROCESS

37.    In or about 2009, Relator transitioned from ULA's Treasury department to its estimating group. Relator's position with estimating included building the financial cost & pricing estimates in response to Requests for Proposals ("RFPs") in both the commercial and government sectors.

38.    The RFPs would specify the government's requirements, the anticipated terms and conditions that will apply to the contract, and the information required to be submitted with the contractor's proposal. Generally, the government would detail the precise costs and pricing data ULA was required to submit with its bid.

39.    The nature of the cost or pricing data would vary depending on the contract type proposed.  A wide selection of contract types is available to the Government and contractors to offer flexibility and customization based on project requirements.

### A.    Contract Types

40.    At ULA, contract types varied according to the amount of time and materials needed as well as the amount and nature of any profit incentive offered to ULA in order to achieve certain pre-determined goals.

41.    Those contracts fall into two broad categories: fixed-price contracts and cost-reimbursement contracts. The specific contract types range from "firm-fixed," in which the ULA assumes all risks/benefits of its cost estimates because it bears all performance costs in exchange for a fixed contract price, to "cost-plus" in which ULA has minimal risk for cost overruns because its profits are predetermined and all costs are reimbursed. In between are various

incentive contracts with tailored cost and profit terms based on the degree of uncertainty involved in the project.

Fixed-Price Contracts

42.     Fixed-price contracts provide for a firm price or an adjustable price based on a set ceiling price, a target price (including target cost), or both. A firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract. In this contract type, ULA bears all risk of cost overruns and all benefit of cost underruns. It provides a strong incentive for ULA to control costs and perform efficiently.

43.     A "fixed-price contract with economic price adjustment" provides for pre-determined upward and downward price adjustments based on specified contingencies, such as increases or decreases in material costs.

44.     A "fixed-price incentive" contract provides for adjusting profit based on the proximity of actual costs to target cost.

45.     A "fixed-price contract with prospective price redetermination" provides for a firm fixed price for an initial period of contract performance and then a redetermination of the price for subsequent periods.

46.     A "firm-fixed-price, level-of-effort" term contract requires ULA to provide a specified level of effort over a stated period of time for a fixed dollar amount.

<u>Cost-Reimbursement Contracts</u>

47.    In cost-reimbursement contracts, the customer pays allowable incurred costs up to a specified amount.  Generally, ULA provides an estimate of cost to establish this ceiling, which ULA cannot exceed without customer approval.

48.    A "cost-plus-incentive-fee" contract is a cost-reimbursement contract that provides for an initially negotiated fee to be adjusted later by a formula based on the relationship of total allowable costs to total target costs.

49.    "Cost-plus-fixed-fee" contracts are cost reimbursement contracts that include a negotiated fee on top of costs. This contract type imposes very little incentive for ULA to control costs and is used where the level of effort is unknown.

**B.    The Initial Proposal Draft**

50.    The Initial Proposal is a response to the customer (e.g., the government's) Request for Proposal; the goal of the estimating group for most proposals considered Mission Unique, that is: proposals that require work unique to a specific launch service and its mission, is to kick-off, establish ground rules, gather data, price the specific inputs, write and edit for submission, and to receive permission from the Change Control Board ("CCB") within a 30-day cycle.

51.    During the aforementioned process every Product Development Team ("PDT") is required to review the RFP to determine if their PDT has any requisite work related to the requirements contained within the RFP.  If a PDT does not, then the PDT will recuse itself from the RFP.

52.    For those PDTs that determine the RFP does, in fact, contain necessary elements to which their PDT must perform work, the PDT is require to write a rather detailed Basis of

Estimate ("BOE"), using the ground rules established during the RFP's kickoff as well as using applicable guidelines as outline in the ULA Estimating Manual and in the FAR.

53.     Each PDT has its own internal policy and procedure for approval of the submission of the BOE to the estimator for review.

54.     Often, a PDT will rely upon other PDTs such as SM&P, the accounting group, etc., as a source for data that verifies or justifies their specific Basis of Estimate for labor hours or material costs. For example: if an RFP contains, as they often do, work and/or material needs similar or the same as a prior mission and contract, a PDT is required to gather this data from the group who manages the historical cost(s) and use it as part of the justification for their BOE.

55.     ULA's Supplier Management & Procurement Division ("SM&P") was responsible for obtaining parts and equipment needed for space launch projects from third party commercial vendors.

56.     For its part in the proposal process, SM&P estimated the labor hours needed to procure parts and materials—the number or hours it would take SM&P employees to go out and buy the materials on the commercial market.

## C.     Internal Review of Proposals

57.     When responding to RFPs above the TINA threshold, ULA would subject its cost estimates to several levels of internal review.

58.     First, each proposal begins by going through a mandatory "kick-off," which brings together all responsible and applicable PDTs of ULA to discuss the required tasks and work outlined in the RFP; the kick-off includes establishing ground rules, objectives, and the manner in which the proposal will be estimated from a cost and pricing perspective.

59.     During the course of the cost and pricing estimation work, a proposal must be reviewed by the assigned estimator, the Mission Manager, the estimating lead, the estimating manager, the assigned contracts lead, and, when TINA cost and pricing certification is required, the proposal must be reviewed by the contract lead, and by the compliance group.  Additionally, all PDTs are required to validate their specific inputs and have their own levels of approval. Generally, each PDT will require a PDT manager to validate the PDTs specific inputs before they are included in the proposal.

60.     If there were no issues with the proposal at the aforementioned levels, the lead estimator would present the proposal to the Change Control Board ("CCB") if the proposal's value is above the TINA threshold. The CCB consists of a designee from each PDT, the estimator for the assigned proposal, the estimating lead of the estimating group, the Mission Manager, and either the director or directors (there are two) of Business Management (or designee); the CCB meets on a weekly basis to vet proposed RFP responses and cost estimates.

61.     At the CCB meeting, the PDTs would present and defend a proposal. Proposals are presented by both the Mission Manager, to discuss the Mission Specific details of the proposal, as well as the assigned estimator who outlines all of the cost and pricing data and financial considerations of the proposal.  All PDTs are required to be represented in order to defend and/or answer any questions relative to Mission Specific matters and financial estimating techniques used with respect to the number of hours of labor they require in the proposal, and any other matters that requires cost or cash outlay to consummate the proposal.

62.     The primary purpose of the CCB was to identify and fix any inaccuracies or other issues with a bid before it was submitted to the customer. Accordingly, the CCB would challenge the proposal regarding the accuracy of the costs estimates or compliance with FAR.

63.     If the proposal passed CCB review, it would be finalized and submitted.

64.     The goal during CCB is to present a valid proposal for submission to the customer, or to challenge any matters that require the appropriate organizational level for approval or denial.  The director or Business Management (or designated proxy) has the final authority to determine if a proposal should be submitted to the customer for consideration, or if the proposal requires more work before submission.

### D.     Historical Data v. Parametric Estimation

65.     The ULA's SM&P's methodology for estimating its labor hours varied significantly depending on the size of the bid. In larger bids (typically greater than $100 Million), SM&P strived to accurately estimate its costs because it knew the bids were subject to audit by the Defense Contract Audit Agency ("DCAA").

66.     If a contract was flagged for review, the DCAA would evaluate the contract price by comparing the information available to contractor as of the date of the bid with the cost or pricing data the contractor actually submitted. If the submitted cost or pricing date was determined to be defective, the DCAA could then unilaterally reduce the contract price.  Nearly all Launch Service proposals that ULA priced under the Evolved Expendable Launch Vehicle Service (ELS) are audited by DCAA; ULA always used cost and pricing data for the estimation of hours, in particular, SM&P labor hours, what were captured in ULA's ticketed accounting system. (For a defense contractor's systems - e.g.: accounting, estimating, etc. - to be considered

"ticketed," the firm must go through rigorous DCMA analysis and test; In the first 5-7 years of ULA's existence most systems failed this audit, including the firm's accounting and estimating systems.)  For Launch Capability contracts (ELC), ULA used a different manner of estimation, even though actual data existed for many of these types of contracts.

67.    Accordingly, whenever the potential for a DCAA audit was present, SM&P had strong incentive to accurately estimate labor hours. Because launch missions often required SM&P to procure the same or similar materials as used in prior launches, historical data was the most reliable indicator of procurement costs.

68.    ULA tracked and recorded SM&P's labor hours using time cards, which is derived from ULA's ticketed accounting system. Each employee's time spent on a particular procurement task was logged on ULA's system, which could then be use to estimate labor costs for future bids.

69.    Use of historical time card data is a common estimation practice that has been approved or "ticketed" by the Defense Contract Management Agency ("DCMA").  The DCMA is responsible for, among other things, audits of contractor estimation systems—the systems the contractor uses to develop, compile, and price proposals. In its larger proposals, ULA would estimate labor hours based on this ticketed system whenever historical data was available.

70.    On the contrary, in smaller bids ULA knew would avoid a DCAA audit, ULA willfully ignored historical data. Instead, ULA relied upon an arbitrary and inaccurate "parametric" (re: the Keith Crohn model) estimation models.

71.    In the context of SM&P, a parametric estimation model simply means that an independent variable (labor hours) is tied to a dependent variable (price of materials).

Parametric models require independent calibration, validation, documentation, and testing; the Keith Crohn model never went through the aforementioned testing. According to the International Society of Parametric Analysis (ISPA) Parametric Estimating Handbook, Appendix B: "all parametric estimating techniques, including Cost Estimating Relationship (CER) models, require credible data before they can be used effectively.

72.     Relator inquired on multiple occasions as to the source of the credible data relating to the Keith Crohn model. As of Relator's departure from ULA, no source for credible data was ever identified.

73.     The Keith Crohn model was modified at different times; however, in all instances, it was simply a grid system that set forth tiers of material costs and the associated labor hours needed to procure them.

74.     The following chart illustrates a pricing grid similar to one or more iterations of the Keith Crohn model:

| Price of Item | Labor Hours |
| --- | --- |
| $0-$1,000 | 8 |
| $1,000 - $10,000 | 16 |
| $10,000 - $20,000 | 32 |
| $20,000 - $40,000 | 64 |

75.     The Keith Crohn model would also double the amount of hours in some circumstances based on a "complexity factor."

76.     Because the Keith Crohn model failed to account for any factors other than the price of materials, it was inherently inaccurate. While the model assumed a constant relationship between cost of materials and labor, there was no evidence to support that direct connection.

77.     Further, the price ranges themselves were inaccurate, which was especially problematic with labor estimates involving inexpensive materials. The grid incorporated a minimum amount of hours to procure any item (e.g., 8 hours of labor at the following labor rates codes: UE01/2, UL01/2, UP01/2, each having a specific per hour dollar rate), so over billing was extreme whenever a proposal involved low-price and easily procured materials.

78.     Relator noted several bids where ULA automatically bid 8 hours of labor to procure parts that costs less than a dollar.  In fact, ULA would bid 8 hours even where the cost of the item was only $.02. In the aggregate, ULA's labor inflation for lower-priced items was substantial.

79.     Despite the imprecise nature of the model, Relator found few, if any, instances where it resulted in *underestimation* of costs. Indeed, Relator found that, labor hours exceeded actuals in nearly every proposal SM&P submitted using the Keith Crohn model.

## VII.     ULA'S INFLATED COST ESTIMATES

### A.     ULA Used the Keith Crohn Model Even Where Actual Cost Data was Available.

80.     In estimating costs, ULA is required to submit proposals in accordance with FAR as well as the ULA Estimating Manual.  Both policies permit the use of parametric estimation models, such as the Keith Crohn model, only where there is limited or no data available to estimate labor costs.

81.    In most cases, TINA required ULA to certify the cost and pricing data underlying a specific bid.  However, even when certified cost or pricing data is not required, a pricing analysis must be conducted to confirm the offered price is fair and reasonable. *Id.* at § 15.404-1(a).

82.    The reasonableness of the price should be determined through parametric estimating methods only where actual data is unavailable.  *Id.* at § 15.404-1(b)(3).

83.    Further, the FAR indicates that parametric models must be appropriately calibrated and validated and must be agreed upon by the customer and approved by the Defense Contract Management Agency ("DCMA"). *Id.* at § 15.404-1(c)(2)(i)(C).

84.    The FAR also requires as follows:

FAR 15.402 Pricing Policy:  Contacting officers shall … (a) Purchase supplies and services from responsible sources at fair and reasonable prices. In establishing the reasonableness of the offered prices, the contracting officer…(2) When certified cost or pricing data are not required by 15.403-4, shall obtain data other than certified cost or pricing data as necessary to establish a fair and reasonable price, generally using the following order of preference in determining the type of data required:…(ii) Data other than certified cost or pricing data such as…(A)…unless an exception under 15.403-1(b)(1) or (2) applies, such data submitted by the offeror shall include, at a minimum, appropriate data on the prices at which the same or similar items have been sold previously.

85.    The FAR section 15.404-1 Proposal analysis techniques provides the following techniques…i) Comparison of proposed prices received in response to the solicitation. Normally, adequate price competition establishes a fair and reasonable price (see 15.403-1(c)(1)(i))…and…(ii) **Comparison of the proposed prices to historical prices paid (re: SBIRS Mission Unique GEO-2 to SBIRS Mission Unique GEO-3)**"

86.    The FAR section 15.404-1 further provides, "(c) Cost analysis.(1) Cost analysis is the review and evaluation of any separate cost elements and profit or fee in an offeror's or

contractor's proposal, as needed to determine a fair and reasonable price or to determine cost realism, and the application of judgment to determine how well the proposed costs represent what the cost of the contract should be, assuming reasonable economy and efficiency.(2) The Government may use various cost analysis techniques and procedures to ensure a fair and reasonable price, given the circumstances of the acquisition. Such techniques and procedures include the following:(i) Verification of cost data or pricing data and evaluation of cost elements, including…(C) Reasonableness of estimates generated by appropriately calibrated and validated parametric models or cost-estimating relationships

87.    15.404-1(c):(ii) Evaluating the effect of the offeror's current practices on future costs. In conducting this evaluation, the contracting officer shall ensure that the effects of inefficient or uneconomical past practices are not projected into the future. In pricing production of recently developed complex equipment, the contracting officer should perform a trend analysis of basic labor and materials, even in periods of relative price stability.(iii) Comparison of costs proposed by the offeror for individual cost elements with—(A) Actual costs previously incurred by the same offeror;

88.    With respect to the DMCA opinion on parametric model usage, the vendor must refer to DMCA-INST 130 dated: 3.3. CONDUCT PROPOSAL ANALYSIS.

a.    3.3.1. The objective of the analysis is to ensure that the final agreed-to price is fair and reasonable (FAR 15.401-1(a)) (Reference (e)).

b.    3.3.2. Cost analysis shall be used to evaluate the reasonableness of individual cost elements when cost or pricing data are required (FAR 15.404-1(a)(3) and (4)) (Reference (e)). Cost analysis is the review and evaluation of any of the separate cost

elements in a contractor's proposal as needed to determine a fair and reasonable price or to determine cost realism, and the application of judgment to determine how well the proposed rates represent what the rates of the contract should be, assuming reasonable economy and efficiency (FAR 15.404-1(c)(1)) (Reference (e)). The cost analysis that can be used by the ACO is included in the "Cost Monitoring Handbook." The handbook is linked in the resource page of the DCMA-INST 123 (Reference (h))…

   c.  3.3.3.8.3. Reasonableness of estimates generated by appropriately calibrated and validated parametric models or cost-estimating relationships.

  89. With respect to agreed upon parametric modeling procedures, the vendor should refer to the International Society of Parametric Analysts; Parametric Estimating Handbook, Fourth Edition; Copyright 2008 (Unlimited Rights Granted to the US Government) ISBN # 0-9720204-7-0

   a.  Parametric Estimating is defined as: Parametric estimating is a technique that develops cost estimates based upon the examination and validation of the relationships which exist between a project's technical, programmatic, and cost characteristics as well as the resources consumed during its development, manufacture, maintenance, and/or modification. (Introduction-2)

   b.  Genesis of the need for a Parametric Modeling handbook for government contractors: A primary responsibility of a project cost estimator is to select the estimating methodology that most realistically estimates program costs, while making the most economical use of the organization's estimating resources. With respect to this requirement, the PCEI identified two general concerns about the use of parametric tools

and techniques, and their ability to adequately support cost estimating requirements for contracting proposals.

        c.      The Truth in Negotiations Act (TINA) data issues is the greatest concern regarding the use of parametric estimating methods. TINA requires that cost or pricing data be certified as current, accurate, and complete as of the date of negotiation or another agreed-to date as close as practicable to the date of negotiation. TINA also requires contractors to provide (disclose) to the Government all the facts available at the time of certification, or an otherwise agreed-to date. Parametric tools should demonstrate that, when properly calibrated and validated, comply with the requirements of TINA.

        d.      Second, the use of statistical representations of historical data as a basis of forward estimates was a major concern for an estimating culture that developed and reviewed reams of paperwork in a bottoms-up environment. This cultural issue was much harder to resolve and required the publishing of this handbook and the development of professional training programs. Thus, publishing this handbook was a top priority of the PCEI. (Introduction-4)

        e.      1.1.1.1 Database Development: a sound database is key to the success of the parametrician. A cost model is a forecast of future costs based on historical fact. Thus, future cost estimates must be consistent with historical data collection and cannot provide a lower level of detail than provided by the historical detail without some allocation or distribution scheme devised by the parametrician.

        f.      Parametric techniques require the collection of historical cost data (including labor hours) and the associated non-cost information and factors that describe

and strongly influence those costs. Data should be collected and maintained in a manner that provides a complete audit trail with expenditure dates so that costs can be adjusted for inflation. Non-recurring and recurring costs should be separately identified. While there are many formats for collecting data, one commonly used by industry is the WBS, which provides for the uniform definition and collection of cost and certain technical information. If this is not the case, the data collection practices should contain procedures for mapping the cost data to the cost elements of the parametric estimating technique(s) which will be used.

g.      The collection point for cost data is generally the company's financial accounting system, which in most instances contains the general ledger and other accounting data. All cost data used in parametric techniques must be consistent with, and traceable to, the collection point. The data should also be consistent with the company's accounting procedures and generally accepted cost accounting practices.

90.     Pursuant to Section 1.1.1.5 Model Calibration and Validation Parametric models should be calibrated and validated before they are used to develop estimates for proposals. Since complex models are based on an organization's historical data, they are considered to be self-calibrated. The validation process, however, applies to all parametric estimating techniques, whether CERs, complex models, or commercial models.

91.     Validation is the process, or act, of demonstrating the complex model's ability to function as a credible estimating tool. Validation ensures:

a.      The model is a good predictor of costs;

b.      Estimating system policies and procedures are established and enforced;

       c.      Key personnel have proper experience and are adequately trained.

92.    The purpose of validation is the demonstration of a model's ability to reliably predict costs. This can be done in a number of ways. For example, if a company has sufficient historical data, data points can be withheld from the model building process and then used as test points to assess the model's estimating accuracy. Unfortunately, data sets available are often extremely small, and withholding a few points from the model's development may affect the precision of its parameters. This trade-off between accuracy and testability is an issue model developers always consider.

93.    Under 1.2 COST ESTIMATING RELATIONSHIPS (CERs) A cost estimating relationship (CER) is the foundation of the art and science of estimating resource needs in projects using parametric methods. The parametric method comprises collection of historical cost data and reducing it to mathematical forms that can be used to estimate similar activities in future projects. The mathematical forms are called CERs. They are most commonly algebraic equations, but sometimes they are tabulated data.

94.    Upon information and belief, the ULA Estimating Manual also permits the use of parametric estimation models, such as the Keith Crohn model, only where there is limited or no data available to estimate labor costs associated with procuring materials.

95.    Despite these regulations and policies, on numerous occasions, ULA relied on the Keith Crohn model—which it knew to be arbitrary and inaccurate—even when it had reliable historical data for the specific costs in question.

96.    For example, using the Keith Crohn model, SM&P bid 492 hours on its labor estimate to the U.S. Air Force for the SBIRS GEO-2 Mission Unique.  The model bid hours

based upon values of materials, regardless of the actual labor associated with those materials. When the project was finished, SM&P incurred only 28 labor hours throughout the life of the contract.

97.    Because the contract was a fixed price agreement, the Air Force paid for 464 labor hours unnecessarily. This amounted to approximately $70,000 for just the SM&P piece of the Mission Unique contract.  In fact, for the entire GEO-2 project, 1,859 hours were bid (and paid) that went unused.

98.    Just after SBIRS GEO-2 launched, ULA received an RFP for the SBIRS GEO-3 Mission Unique. The Statement of Work ("SOW") was nearly identical to the SBIRS GEO-2 Mission Unique contract, i.e. ULA had already estimated, performed, documented within its ticketed accounting system, and completed essentially the same SOW.

99.    In fact, the Bill of Materials (BOM) for SBIRS GEO-3 Mission Unique eliminated several items from its BOM (i.e. Common Avionics was had been achieved between ULA's two rocket lines, the Atlas and the Delta, as well as, DAVIS requirements were moved from the Mission Unique RFP to the Launch Service contract) and therefore required by far less SM&P labor hours than the SBIRS GEO-2 Mission Unique requirements of the prior launch. Moreover, a natural and documented learning curve resulted in further reduction SM&P's labor having gained experience from the first launch.  In total, Relator determined SM&P's labor hours for SBIRS GEO-3 Mission Unique would require 86% less material effort than SBIRS GEO-2 Mission Unique based on the Actual Labor Hour data captured in ULA's ticketed system.

100.   Nevertheless, SM&P bid 400 hours of labor in the new proposal for SBIRS GEO-3 Mission Unique, which was only slightly less than the already inflated SBIRS GEO-2 Mission

Unique bid. Although ULA knew full well that SBIRS GEO-2 Mission Unique costs were

drastically overestimated, ULA's bid for SBIRS GEO-3 Mission Unique inflated costs to an even

greater degree.

### B.        ULA Withheld Cost and Pricing Information From the Customer

101.   In connection with each contract, subcontract, or modification governed by TINA,

ULA certified to the customer that had provided all information available to ULA "including all

the facts that can be reasonably expected to contribute to the soundness of estimates of future

costs." For most, if not all, bids ULA submitted based on the Keith Crohn model, this was a

misrepresentation.

102.   In many cases, ULA possessed historical data that provided a highly accurate

benchmark for cost estimation. In its bids to numerous U.S. government customers over the

years, ULA withheld this data in violation of TINA.

103.   Upon information and belief, for all bids submitted using the Keith Crohn model,

ULA never informed the customer that ULA possessed historical data for the same or similar

labor costs.  Indeed, ULA never informed any customer that it possessed actual data that

squarely contradicted the estimates submitted with ULA's bids.

104.   For example, in the case of SBIRS GEO-3 Mission Unique, estimation was largely

unnecessary as exact costs were known from the SBIRS GEO-2 launch, occurring only months

prior to the SBIRS GEO-3 Mission Unique proposal.  However, when ULA submitted (inflated)

estimates and certified that it had provided the customer with all relevant data, ULA intentionally

withheld cost & pricing data for a virtually identical project.

**C.     ULA Used the Keith Crohn Model Knowing it Would Inflate Costs.**

105.   Although the customer generally did not have access to time card data after a mission launched, the price inflation did not always go unnoticed.  Many customers suspected ULA was guilty of price gouging, but lacked the resources or information necessary to investigate ULA's true costs.

106.   In or about 2012, the NRO complained of price inflation in connection with several missions, including those under the NRO Integration Companion (NIC) contract.  The parties ultimately renegotiated the contract price, resolving their dispute; however, the NRO's concerns were well-founded.  The agreement between the NRO and ULA relative to having cost & pricing data that was more accurate was not applied to any other customer's contract, which contradicts the nature of using estimating techniques in a ubiquitous fashion and across all government customers.

107.   Relator reviewed SM&P's hours for twenty-three NRO missions conducted over a four-year period, comparing SM&P's estimated hours with the actual hours incurred. Cost inflation was over 50%.

108.   The following Chart lists those missions along with the estimated proposal hours and the actual hours incurred.

| Mission | Proposal | Actuals |
|---|---|---|
| L32: Mission Integration | 1216 | 235 |

| L41: Mission Integration | 1,196 | 99 |
|---|---|---|
| L61: Aft ring | 28 | 1.5 |
| L65: 3 door Mission Integration, Additional scope, FY13 disclosure. | 2592 | 379 |
| L67: LEI, Mission Integration | 548 | 37 |

109.   In the course of investigating NRO's complaints, ULA determined that it had overestimate labor hours in connection with several components of the contract, such as Launch Services or "ELS."  As part of ULA's negotiations with the NRO, ULA adjusted its estimation procedures in order to create more accurate estimates for ELS costs for all future NRO missions. In fact, ULA and the NRO agreed to penalize award fee (profit) should any future contract costs fall outside of a percentage band from the original estimate and subsequently agree upon contract cost.

110.   However, in its contracts with other customers, ULA continued to use the Keith Crohn model to estimate the same ELS costs, knowing the model would produce inflated results.

**D.     ULA Knowingly Submitted inflated estimates for ELC**

111.   ELC are those contracts that fall under the Evolved Expendable Launch Vehicle (EELV) Launch Capability program.

112.   SM&P's estimating of labor costs for ELC contracts uses ticketed system data maintained in ULA accounting databases as well as tested learning curves, and does not differ from this approach between missions.

113.   Accordingly, when ULA discovered the Keith Crohn model resulted in inflated ELC costs to the NRO, it knew the model would also inflate Launch Capability costs on other missions. However, ULA continued to use the model.

114.   After ULA reached an agreement with the NRO, it proceeded to estimate the same ELC costs using two different methods. In connection with NRO contracts, ULA would use historical data to accurately estimate accurate costs.  For any other contract, ULA would bid larger amounts using the Keith Crohn model. Thus, ULA would bid drastically different amounts for the same ELC costs if the customer was not the NRO (e.g., the Air Force, Navy, etc.).

115.   Upon information and belief, ULA knowingly inflated labor estimates for ELC and other services in connection with numerous other government contracts with NASA, the U.S. Air Force, and other groups.

**E.     ULA Faulty Estimation Practices have Cost the U.S. Government as Much as $90M or More.**

116.   Upon information and belief, ULA has billed the U.S. Government for tens of thousands of hours of work that was never performed, at a cost of as much as $90M or more.

117.   The manner in which ULA defrauded the government varied depending on the nature of the contract in question.

118.   In a "fixed-price" contract, the parties negotiated a profit percentage (typically 10%) based on a reasonable estimate of ULA's costs.  While ULA bore the burden of cost over-runs and benefit of costs under-runs, the profit percentage was tied to what the government believed was a substantially accurate estimate of ULA's anticipated costs. By knowingly inflating its cost estimates, ULA increased its profits beyond the agreed-upon rates.

119.   In a cost-reimbursement contract, the price is often determined by actual costs incurred by ULA plus a fixed profit percentage calculated from proposed costs.  However, ULA's fixed profit percentage is based on *estimated* costs and does not change once actuals are known.  For instance, if ULA submitted a proposal estimate for $20,000,000 at 10% fixed profit, ULA would receive $2,000,000 profit even if the actual costs turn out to be only $10,000,000 (increasing the effective profit margin to 20%).  In fact, on the SBIRS GEO-2 Mission Unique contract, the profit margin was above 40%.

120.   Thus, ULA knowingly increased its profit margin by submitting inflated price estimates. In many instances, ULA increased its profit margins to rates precluded by applicable law. *See* 10 U.S.C. § 2306(d); FAR 15.404-4(c)(4)(i) (limiting profit margins to 10% or 15% for most contracts).

121.   At all relevant times, ULA was fully aware its estimation models grossly inflated labor costs. Indeed, the existence of price gouging at ULA was undeniable given the historical data (proposal vs. actuals), complaints from customers such as the NRO, and auditor findings.

122.   Nevertheless, ULA continued to rely on its faulty estimation models even when actual data for the specific costs was available and in fact required.

### VIII.   RELATOR'S COMPLAINTS AND ULA'S RETALIATION

### A.      Relator Attempted to Curb ULA's cost inflation.

123.   Relator raised his concerns regarding numerous bids (including SBIRS GEO-3 Mission Unique) with SM&P, his supervisor, the lead manager, the mission manager, and the director of Business Management as well as with SM&P Lead, the director of Compliance and compliance reviewers who were required to review every proposal above the TINA threshold. At

each stage, ULA would tacitly acknowledge the problem, but then direct Relator to submit the bid to the customer as prepared.

124.   In or about 2nd quarter of 2013, Relator challenged the SBIRS BEO-3 Mission Unique proposal at a Change Control Board meeting.  He outlined his concern that the Keith Crohn model was entirely arbitrary and would inflate labor hours to an even greater amount than did the SBIRS BEO-2 Mission Unique bid.

125.   Relator used the actual time card data to show that SM&P bid 492 hours on its labor estimate for the SBIRS GEO-2 Mission Unique, but incurred only 28 labor hours. He further noted that the SBIRS GEO-3 Mission Unique tasks were nearly identical to the prior mission, and even lesser in a number of areas, including the Common Avionics and DAVIS components, but ULA was using the same inflated estimates. Relator warned that if uncorrected, the proposal would result in even greater inflation than the prior mission.

126.   Relator also voiced his concerns pursuant to a Permission to Submit Proposal by discussing his concerns with every level of approval as described above.

127.   When those attempts failed, Relator challenged the proposal directly with the Director of Business management, Bob Wernke.

128.   Finally, Relator, as the Estimating Lead for the proposal, obtained an agreement from both the Estimating Supervisor and the SBIRS Mission Manager to use actual labor hours for pricing. However, SM&P refused to comply with the mandate.

129.   This was not the first, nor the last, time Relator would raise these same issues. Relator and other estimators complained of the overcharges in connection with numerous other proposals for various government customers.

130.   ULA refused to address the issue and directed the estimating group to continue submitting the inflate estimates as prepared.

131.   Relator repeatedly pointed out to many internal stakeholders that the Keith Crohn model contradicted ULA's own internal Estimating Manual with respect to consistency in estimating practices. ULA uses actual data or agreed-upon and audited parametric models on all its larger, audited proposals, yet inexplicably employs an entirely different method for smaller projects.

132.   Concerned with what he was finding for a small number of proposals, Relator analyzed approximately 36 other proposals and determined that the hours bid versus actuals was approximately 50% greater.  He again brought this to the attention of ULA management. Relator even built and presented a computer based tool to track in a very detailed manner labor hours for all PDTs, and labor pools to the task level; the tool was designed to robustly track all labor hours and warehouse them in a database for future use in the creation of BOEs; the tool was presented to the director of Business Management, the Vice President of the Delta and Atlas Programs, and many PDT directors.  Even though all agreed that the tool created a definitive method to track, analyze, and warehouse actual labor hours consumed for specific tasks on every mission and contract, the actual implementation of it was postponed time after time.

133.   Upon information and belief, ULA never notified the Air Force of the investigation or the outcome, nor did ULA ever disclose to the Air Force or any other federal government contracting authority, that ULA's modeling technique overstated the actual labor costs.

134.   Numerous ULA officers privately expressed agreement with Relator's findings; however, no corrective action was taken by ULA.

### B.      ULA's Retaliation

135.   On or about the first quarter of 2013, Relator circulated a formal report titled *Within ULA: Protectionism, Stealing Work & Fraud* ("White Paper").  The White Paper identified the issues with ULA's bidding practices and cautioned that ULA's conduct amounted to fraud on the U.S. government.

136.    Rather than truly objectively investigate and address Relator's concerns, ULA conducted two ethics investigations on *Relator*.  This included placing a camera above his desk, monitoring and questioning his cell phone and computer usage, and otherwise suggesting that Relator somehow violated the FAR himself.

137.   Relator's tenure within Estimating was consistently marked by positive annual performance reviews. His documented employment history notes success on far-reaching organizational projects that led to measurable increases in timely proposal submissions as well as projects leading to practices that ULA still uses. In fact, the senior manager of estimating, Dave Boggy, recommended Relator for a promotion.

138.    Further, with respect to the two ethics investigations, Relator was exonerated of any wrong-doing after both investigations.

139.   Nevertheless, after Relator raised issues related to ULA's bidding, ULA began decreasing Realtor's workload to nearly nothing while his peers all saw increases.  In fact, the Estimator that sat immediately next to Relator consistently worked 6 days per week, yet Relator's request to be allocated some of the workload was denied without explanation.  Instead, ULA brought in two additional employees from outside the Estimating group to work with overflow issues.

140.   In the meantime, an Ethics Officer with ULA and numerous other employees candidly agreed with Relator (off-the-record) that there were issues with ULA's bidding practices, and that the issues raised specifically as they related to overbidding labor hours by SM&P were legitimate and with merit.

141.   In or about May 2013, ULA announced to its employees that it was anticipating a reduction in workforce at the beginning of the following year.

142.   In or about early into the second quarter of 2013, the new manager of estimating (Richard Valore) informed Relator that he should get "his resume ready," i.e. that Relator would be identified for an involuntary reduction in force.  Thus, Relator was forced to choose between a forced layoff with no severance package or a voluntary layoff with some severance.

143.   Upon information and belief, ULA's decision to terminate Relator's employment was retaliation for Relator's challenges to ULA's bidding and estimating practices.

144.   In or about September 2013, Relator submitted a request for voluntary reduction of workforce.

145.   Ultimately, ULA did not pay Relator a severance due to his refusal to sign a comprehensive release of all claims against ULA.

146.   Relator left ULA on or about January of 2014.

147.   Relator then took a position with Merrill Lynch as a wealth advisor and investment manager where he earned roughly half of his salary at ULA and lost significant benefits, including a full pension. He also sacrificed years of developing a career in wealth management, so that he could pursue a long-term career with ULA.

## IX.   CLAIMS

## CLAIM I: FALSE CLAIMS ACT

148.   Relator re-alleges and incorporates by reference the paragraphs set forth above.

149.   This is a claim by Relator for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 through 3733 against ULA for knowingly causing to be presented, or conspiring to present false claims, to the U.S. Government.

150.   From 2006 through October 2013, Defendants knowingly and willfully caused to be presented, or conspired to present, false claims to various U.S. government entities in connection with ULA's space launch services.

151.   Such claims were false because Defendants' knew, or acted with substantial disregard for the truth or falsity, that the claims for payment were based on inflated costs estimates.

152.   ULA knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim for payment in connection with its space launch services.

## CLAIM II: RETALIATION PURSUANT TO 31 U.S.C . § 3730(h)

153.   Relator re-alleges and incorporates by reference the paragraphs set forth above.

154.   Relator was an employee of ULA.

155.   Relator was discriminated against and ultimately discharged by ULA because of his lawful acts in furtherance of his efforts to stop one or more violations of the False Claims Act.

156.   Relator has been damaged as a result of ULA's retaliatory conduct.

## CLAIM III:  WRONGFULL TERMINATION BASED UPON RETALIATION

157.   Relator was employed by ULA at all relevant times.

158.   The State of Colorado has a clearly expressed public policy against terminating an employee in retaliation for the employee's good faith attempt to prevent the employer's participation in fraud or deception on the U.S. government.

159.   ULA constructively discharged Relator by stripping him of responsibilities, subjecting him to unwarranted and retaliatory investigations and monitoring, and by informing him that his discharge was imminent unless he agreed to a voluntary lay-off.

160.   ULA discharged Relator because Relator attempted to stop ULA's practice of deceiving or defrauding the U.S. government.

161.   Relator has been damages as a result of ULA's conduct.


WHEREFORE, Relator, Joseph Scott, respectfully requests a jury trial on all issues so triable, and for this Court to enter judgment against Defendant, United Launch Alliance, LLC as follows:

a.     That the United States of America be awarded damages in the amount of three times the damages sustained by the United States of America because of the false claims alleged within this Complaint, as provided by the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

b.     That civil penalties of $11,000 be imposed for each and every false claim that ULA presented or caused to be presented to ULA's U.S. government customers.

c.     That Relator be awarded the maximum amount allowed under the False Claims Act for his False Claims Act claims; and

d.      That Relator be awarded damages for ULA's retaliation and wrongful termination of Relator, including damages equal to two times the amount of back pay, interest, and any special damages sustained as a result of ULA's retaliation and/or discrimination against him, including litigation costs and reasonable attorneys' fees, as provided by the False Claims Act, 31 U.S.C. §§ 3729 *et seq*; and

e.      That pre- and post-judgment interest be awarded, along with reasonable attorney fees, costs, and expenses which Relator necessarily incurred in bringing and presenting this case; and

f.      That this Court award such other and further relief as it deems proper.

Dated: February 11, 2016                                 Respectfully submitted,

*s/ Michael J. Gates*
Michael J. Gates
Foster Graham Milstein & Calisher, LLP
360 S. Garfield Street, 6th Floor
Denver, CO 80209
303-333-9810